Filed 5/29/13  In re F.V. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re F.V. et al., Persons Coming Under the
Juvenile Court Law.

| | |
|---|---|
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E057270 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ1100159) |
| v. | OPINION |
| T.V., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John M. Monterosso,
Judge.  Affirmed.

Megan Turkat-Schirn, under appointment by the Court of Appeal, for Defendant
and Appellant.

Pamela J. Walls, County Counsel, and Carole A. Nunes Fong, Deputy County

Counsel, for Plaintiff and Respondent.

1

I

INTRODUCTION[1]

T.V., father, appeals from a judgment of the juvenile court terminating his parental

rights to two children.  Father argues the beneficial parental bond exception applies and

the court should have ordered legal guardianship instead of adoption.  After thoroughly

reviewing the record, we reject father's appeal and affirm the judgment.

II

FACTUAL AND PROCEDURAL BACKGROUND

*A.  Detention*

CPS[2] filed an original dependency proceeding (§ 300) in March 2011, concerning

three children:  M.V., born in 1993; F.V., born in 1995; and S.V., born in 1999.[3]  The

petition alleged the parents had failed to protect the children because of mother's bipolar

disorder, her abuse of prescription medication and arrest for driving under the influence

in February 2011, and her neglect of M.V.'s mental health treatment, and father's neglect,

emotional instability, and arrest in March 2011.

According to the detention report, the family had a history of previous dependency

referrals in Los Angeles County between 1993 and 1999 and in Riverside County

---

[1]  All statutory references are to the Welfare and Institutions Code.

[2]  Riverside County Department of Public Social Services, Child Protective
Services.

[3]  M.V. is now a 20-year-old adult and is not a subject of this appeal.  F.V. turns
18 in May 2013.

between 2001 and 2010. In January 2011, CPS received a referral that mother had been treating M.V. with her own prescription medication, which could cause seizures. In interviews, M.V. and mother admitted she had once given him the prescription medicine Atavan. M.V. said he had not taken any medicine or visited a doctor in months. On February 28, 2011, mother was arrested while driving under the influence of prescription medicine. On March 3, 2011, father was arrested after he was aggressive and combative with a deputy sheriff during a home visit by CPS. Mother was unkempt, displayed poor hygiene, and appeared under the influence. M.V. was placed in a group home and F.V. and S.V. were placed with a Non-Relative Extended Family Member (NREFM).

At the detention hearing on March 8, 2011, the court found a prima facie case had been demonstrated under section 300, subdivision (b), and ordered F.V. and S.V. detained. M.V. was not detained and was left in the custody of the parents because he was about to turn 18. On May 30, 2011, the court ordered F.V. to be given psychotropic medication. On April 1, 2011, the dependency petition was amended to allege that parents abused controlled substances instead of prescription medication. CPS recommended M.V. be dismissed from the petition because he was 18 years old.

B. *Jurisdiction and Disposition*

According to the jurisdiction and disposition report, mother denied abusing prescription medication but she admitted giving M.V. medicine on one occasion. Both parents emphatically denied the other allegations. Both parents had a history of drug use and criminal offenses. Mother tested positive in March 2011 for methamphetamine, amphetamine, and cocaine. Father initially refused to submit to drug testing.

3

F.V. thought mother has mood swings because she was bipolar and that she benefited from medication. F.V. was depressed and angry. He had tried to commit suicide at age 13 before his mother stopped him. He continued to fantasize about suicide. On March 11, 2011, he had to be committed under section 5150. F.V. was failing classes and was having attendance and disciplinary problems.

S.V. was not verbally expressive. She was in the sixth grade and had poor attendance and grades. She enjoyed soccer and had a strong bond with her family.

Mother had used drugs as a teenager. She became involved with father when she 13 and he was 18, becoming pregnant with their first child, Amber, in 1989 when she was 15. Their second child, Justin, was born in 1991. Mother and father asserted they had a positive relationship except for arguing about money. They did not engage in domestic violence.

Mother was taking Klonopin for bipolar disorder. She was unemployed but trying to obtain employment as a certified nursing assistant. Otherwise she was receiving $1,190 in cash assistance and food stamps.

Father admitted he had used drugs in the past but denied current usage. Father was under treatment for diabetes and he had been suspended from working as a driver. Father was seeking disability benefits and hoping to get a government loan to buy his own truck.

The parents had been successfully having four-hour supervised weekly visits. Father was taking S.V. to her soccer games.

CPS concluded that the parents were loving and concerned but unwilling to seek

4

proper treatment for mother's mental health problems. F.V. was also struggling with untreated mental health issues and both children were doing poorly in school. CPS recommended the parents receive reunification services.

In April 2011, the children were placed with a family friend, Sheila, whom they regarded as a "second mom."

CPS reported that, on May 3, 2011, mother tested negative and father tested positive for marijuana and that mother was not receiving mental health treatment because she was not submitting to drug testing. Mother was also not enrolled in parenting education. Father had not begun counseling or anger management courses and he was evading drug testing. Father submitted a letter about services he had completed in Los Angeles County during previous dependency proceedings.

At the contested jurisdictional hearing on May 10, 2011, the court sustained the dependency petition, finding the allegations were true by a preponderance of evidence. The children were removed and the parents were ordered to have reunification services.

*C. Six-Month Status Review*

In its six-month status review report for November 2011, CPS described mother as a 37-year-old homemaker. She managed the household and its finances. She took psychotropic medicine for her bipolar disorder. Her only current criminal case was the pending charge of driving under the influence. Mother resisted drug treatment and drug testing. Mother was erratic in attending psychiatric appointments. She had not completed a parenting course.

Father was 44 years old and receiving $1,100 monthly in disability benefits. He

was diabetic with no current criminal history. Father had not enrolled in substance abuse treatment or anger management. He had not started therapy. On September 30, 2011, father tested positive for methamphetamine.

The parents were supposed to have visitation once a week for four hours but the parents were irregular in their visitation. Both parents wanted the children returned to them.

F.V. needed eye glasses, 18 cavities filled, and five root canals. F.V. had completed a juvenile probation. F.V.'s behavior and grades had improved at school and he was benefitting from therapy.

S.V. also needed dental care for root canals and 13 cavities. S.V. was playing soccer and drums in the school band. Her grades and attendance had improved. Her therapist reported she had been negatively affected by her parents' drug use and domestic violence and mother's bipolar behavior. S.V. was depressed and protective of her parents.

CPS concluded it would not be appropriate to return the children to the parents. The parents were delinquent in their rent payments and their expenses exceeded their income. The parents had not completed any reunification services and visited the children only sporadically. Sheila, their caretaker, was a prospective adoptive parent. The children were comfortable in their current placement.

The status review hearing was held on November 8, 2011. Neither parent had complied with the case plan and they did not attend the hearing. F.V. attended the hearing and told the court he was feeling good about his progress which he attributed to

6

his foster mother: "She put me in the right path and showed me how to do a lot of right decisions. [¶] . . . [¶] . . . Mostly be more responsible for my actions, how not to lie. Because if you do lie, there's consequence; and basically a lot of things that my parents didn't really show me that much." F.V. continued to receive psychotropic medication. The court authorized unsupervised day visits with parents to continue.

*D. Twelve-Month Status Review*

In May 2012, CPS recommended terminating reunification services, decreasing visitation, and setting a hearing on a permanent plan of adoption. F.V. and S.V. were still placed with Sheila. The parents and M.V. were living together.

Mother was not taking her medication and appeared unstable. She had not participated in substance abuse treatment, drug testing, therapy, or parenting courses. Father was no longer receiving disability benefits. He was losing his home and filing for bankruptcy. Father had been arrested for drug offenses and other charges in October and December 2011. He was not participating in substance abuse treatment, drug testing, anger management, or therapy.

The parents did not have working electricity in November 2011 so they could not have the children for overnight visitation. During the wedding of his older son, Justin, in January 2012, father became involved in an altercation, which was upsetting for the children. The parents did not visit the children regularly and their visits worried the children. After the wedding, there were no more in-person visits with the parents and the children although the parents did call the children occasionally. In February 2012, father called and left threatening messages for S.V. Mother was arrested in March 2012. The

7

parents also moved to La Puente in Los Angeles County. F.V. was worried but hoped his parents would improve.

Both children were doing well in their placement with Sheila. F.V., age 16, was improving in school and making plans for independent living. In therapy, he was learning to share and be respectful and verbal about his feelings. He was coping with his anger and disappointment about his parents' failure to follow their case plan. S.V., age 13, was also improving in school because of her foster placement. She was depressed about her parents but benefiting from therapy. S.V. wanted to live with Sheila because it was "a better way of life for me." Sheila was fully committed to adoption.

At the 12-month review hearing on June 6, 2012, the court commented, "there is ample evidence that both parents have failed miserably to complete any services and make any progress whatsoever in their case plans" because they were not enrolling in services or visiting with the children.

The court terminated reunification services, decreased visitation to twice a month, and set a hearing on a permanent plan of adoption.

*E. Section 366.26*

After the June 2012 hearing, CPS could not locate either parent. In August 2012, mother was arrested and released but was homeless. On September 5, 2012, CPS confirmed that father was in jail in Banning for drug possession.

In October 2012, F.V. was a high school senior, on track for graduation. His therapy was proceeding successfully. S.V. was in the seventh grade, making good grades and also benefiting from therapy. The children's placement with Sheila offered stability

8

and security whereas they had not been in actual contact with the parents since before June 2012. They were in contact with their older siblings and their maternal grandfather.

The children were adoptable, even though they were 17 and 13 years old. According to CPS, the prospective adoptive parent had "spent long and tireless hours trying to undo some of the damages that the parents did to their children. The children continue to struggle with emotional problems and they continue to feel 'let down' by their parents when the parents do not call them. The children are really affected by the fact that the parents . . . have made no attempts in recent months to spend time with them. Even though the children know that they are in a stable and secure placement, they continue to feel rejected by their parents and this has caused them [undue] stress. They will need ongoing therapeutic services to help work out their feelings and help them become more understanding of the disappointments they feel regarding their parents' continued drug abuse." The children wanted to be adopted. The prospective adoptive parents were Sheila and her husband, who both worked for a towing company, and had been assessed by CPS.

The contested section 366.26 hearing occurred on October 5, 2012. Father was present in custody. Mother did not attend. Father asked the court not to terminate parental rights and to order legal guardianship, based on the parental bond exception. The court found there was no beneficial relationship, the children were likely to be adopted, and adoption was in their best interests. The court terminated parental rights and set a post-permanency hearing for adoption.

## III

## BENEFICIAL PARENTAL BOND EXCEPTION

Father contends the juvenile court's selection of adoption as the permanent plan for the children and termination of parental rights was unsupported by substantial evidence because a beneficial parent/child relationship existed between father and the children. Father argues legal guardianship would be a better plan because it would preserve his relationship with the children.

### A. *Standard of Review*

The substantial evidence test is generally the appropriate standard for review of the juvenile court's findings and orders terminating parental rights for purposes of adoption pursuant to section 366.26. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553; *In re Josue G.* (2003) 106 Cal.App.4th 725, 732.) The review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review. (*In re K.P.* (2012) 203 Cal.App.4th 614, 621-622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)

### B. *Discussion*

Adoption is the permanent plan preferred by the Legislature when a child cannot be returned to the care of the parents. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1416.) Once the children were determined to be adoptable, father had the burden to establish termination of parental rights would be detrimental under one of the exceptions to section 366.26, subdivision (c)(1)(B). (*In re C.F. supra,* 193 Cal.App.4th at p. 553.) Section 366.26, subdivision (c)(1)(B)(i) states that there can be no termination of parental

rights where the parents "have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." Application of the exception requires the parent to prove that 1) the parent maintained regular visitation and contact, and 2) the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i); *In re Zeth S.* (2003) 31 Cal.4th 396, 412, fn. 9.) Adoption is still preferred. (*In re C.B.* (2010) 190 Cal.App.4th 102, 122.)

Father cannot establish the first prong of the exception. Although father expressed love for his children, his visitation and contact was sporadic and inconsistent after August 2011 and during the rest of the dependency proceedings. In November 2011, the parents did not have a residence the children could visit. In January 2012, father created a disturbance at the family wedding and later threatened S.V. in telephone calls. In April 2012, the parents had moved to Los Angeles County and were not visiting the children. Between June and October 2012, father had no contact with the children other than a few telephone calls.

Father asserts, in a new argument on appeal, that he was prevented from visiting whenever he was in jail and after he was arrested on a drug charge on August 3, 2012. His claim of being in and out of jail during the whole of the dependency proceedings is not supported by the record, as demonstrated in respondent's brief. Instead, the record shows that father failed to maintain regular visitation and contact for at least 15 months between August 2011 and October 2012, even when he was not in jail. Sporadic visitation does not satisfy the first prong of the beneficial relationship exception. (*In re C.F., supra,* at 193 Cal.App.4th at p. 554.)

11

Father also has not satisfied the second prong of the beneficial relationship exception by showing that a benefit existed for the children and termination of parental rights would be detrimental when contrasted with the permanency and stability of adoption.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  Section 366.26 requires a comparison of "the strength and quality of the natural parent/child relationship in a tenuous placement against the security and sense of belonging a new family would confer."  (*Autumn H.,* at p. 575.)  The parent must establish the parent/child relationship is of such strength that severance would deprive the child of a substantial, positive emotional attachment such that the child would be *greatly harmed* if the relationship was terminated.  The parent/child relationship warranting preservation cannot confer "some incidental benefit," but must result "from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation."  (*Ibid.*)

In order for the beneficial relationship exception to apply, father must show he "occupies a parental role" in the life of his children.  (*In re Mary G.* (2007) 151 Cal.App.4th 184, 207; *In re C.F., supra,* 193 Cal.App.4th at p. 555.)  "The factors to be considered when looking for whether a relationship is important and beneficial are:  (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs.  [Citation.]"  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1349-1350.)

Father cannot show that he occupied a parental role.  It is essentially undisputed that father was incapable of providing a stable home and physical care.  Although the

children are teenagers and lived with their parents until March 2011, the effect of the parental relationship was almost entirely negative and did not meet the children's needs. Father was often angry and hostile toward the children. The children had not received proper medical and dental care and they were doing poorly in school. S.V. complained about not having adequate food. The children themselves recognized that their foster family offered them stability and security. They preferred to be adopted.

When considering the totality of factors, the juvenile court had substantial evidence to find that the parental bond exception did not apply and that the children would not suffer "great harm," if their relationship with father was terminated. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853.) Father did not visit the children and he did not offer them any significant benefits. The children's needs were being met by a prospective adoptive family willing to provide them with the stability and permanency they needed through adoption.

Under these circumstances, this case is not like *In Re Brandon C.* (1999) 71 Cal.App.4th 1530, in which a positive relationship with a parent could provide a "safety valve in the future, if need be." (*Id.* at p. 1537.) Father's proposed alternative for guardianship is not the better plan.

IV

DISPOSITION

Father cannot establish either prong of the beneficial relationship exception. We

13

affirm the juvenile court's findings and orders terminating parental rights.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.

14